**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Christopher John BOYCE,**
**Defendant-Appellant.**

**No. 77–3336.**

United States Court of Appeals,
Ninth Circuit.

March 26, 1979.

Rehearing Denied May 2, 1979.

**1248**

George L. Chelius (argued), Irvine, Cal., William A. Dougherty (argued), Tustin, Cal., for defendant-appellant.

David R. Homer, Dept. of Justice (argued), Washington, D. C., Richard A. Stilz, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before ELY and HUFSTEDLER, Circuit Judges, and MUECKE,* District Judge.

HUFSTEDLER, Circuit Judge:

Boyce appeals from his conviction for multiple offenses growing out of a conspiracy to sell to the Union of Soviet Socialist Republics information classified as top secret by the United States Central Intelligence Agency ("CIA"). Boyce contends that (1) his confession and evidence found during a search of his home should have been suppressed because both were the fruit of an invalid arrest warrant, (2) his confession should have been excluded because it was obtained in violation of his *Miranda* rights, (3) the evidence was insufficient to sustain his conviction for violating 18 U.S.C. § 798 because the information that he transmitted to the Russians was improperly classified, (4) the evidence was insufficient to convict him for violating 18 U.S.C. § 641 because the statute is inapplicable to misappropriation of the Government's intangible interests in the documents that were photographed, (5) the filmstrips were improperly admitted because

the Government failed to establish a proper chain of custody, (6) the district court improperly denied him discovery, and (7) the district court erred in refusing to sentence him under the Federal Youth Corrections Act.

In 1974, Boyce was employed by TRW, Inc. in its classified communications center. Upon receiving his security clearance, he was assigned to operate an encrypted teletype system for communication with the CIA in Langley, Virginia. Boyce and his long-time friend and co-defendant, Andrew Daulton Lee, conspired to sell to the Russians classified information to which Boyce could gain access through his employment. During 1975 and 1976, Lee sold the Russians thousands of documents or photographs of documents provided by Boyce. The U.S. S.R. paid them $70,000, of which $15,000 went to Boyce.

On January 6, 1977, Lee was arrested by Mexican police in front of the Soviet Embassy in Mexico City. In his possession were filmstrips containing photographs of the "Pyramider" documents, a TRW study of a worldwide communication satellite system to be used by American agents in "denied areas" of the world. The study was commissioned by the CIA and was classified top secret. Lee confessed his espionage role and implicated Boyce. Although Lee's confession was not introduced at the trial, his confession together with the documents found in his possession were the basis for an affidavit of an FBI agent that was used to obtain a warrant for Boyce's arrest. Boyce was arrested on the warrant, and he confessed his part in the scheme.

Boyce and Lee were charged with conspiring to transmit national defense information to a foreign nation, with aiding and abetting an attempt to transmit national defense information, with conspiring to gather and actually gathering national defense information intending, or having reason to believe, that the information would

*Honorable C. A. Muecke, United States District Judge, District of Arizona, sitting by designation.

be used to the advantage of a foreign nation, with unauthorized possession of national defense information and transmitting such information to non-authorized persons, with disclosure of classified information, with acting as an agent of a foreign government without prior notification to the Secretary of State, and with theft of government property valued in excess of $100, in violation of 18 U.S.C. §§ 641, 793, 794, 798, and 951. Boyce was found guilty on all counts and was sentenced to two 40-year terms and six 10-year terms, all to run concurrently.

## I

Boyce contends that the affidavit in support of the arrest warrant failed to meet the tests of *Aguilar v. Texas* (1964) 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, and *Spinelli v. United States* (1969) 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. He argues that the foundation for the affidavit used to obtain the warrant was information derived from Lee, who was not shown to be a reliable informant, and from hearsay that was inadequately supported. Contrary to Boyce's contentions, the affidavit fully meets the *Aguilar-Spinelli* tests. Lee was not an untested paid informant or a volunteer police informant. Lee's statements inculpated both himself and Boyce in the commission of a federal crime. His statements were admissions against Lee's penal interests and they are deemed reliable. (*Louie v. United States* (9th Cir. 1970) 426 F.2d 1398; *United States v. Ashley* (5th Cir. 1978) 569 F.2d 975; *Wooten v. United States* (5th Cir. 1967) 380 F.2d 230. See Fed.R.Evid. 804(b)(3).) Lee's inculpatory information was corroborated by further facts recited in the affidavit, including photographic negatives of top secret documents found in Lee's possession when he was arrested and information that Boyce had been employed by TRW in the area where the Pyramider documents were kept. The affidavit was more than adequate to support the issuance of the warrant. (*Draper v. United States* (1959) 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; *United States v. Garrett* (9th Cir. 1977) 565 F.2d 1065; *United States v. Graham* (8th Cir. 1977) 548 F.2d 1302; *United States v. Canieso* (2d Cir. 1972) 470 F.2d 1224.)

## II

Boyce's primary attack upon the admission of his confession is that the confession was obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. He contends that his right to silence was not respected because FBI agents continued to interrogate him after he asserted his right to remain silent (1) when he initially refused to sign a written waiver of his *Miranda* rights, and (2) when he later expressly asked to discontinue interrogation. He also claims that the written waiver that he thereafter signed is invalid because it was obtained by psychological coercion, and that apart from *Miranda*, his confession was involuntary because he yielded to psychological pressure.

Boyce's arguments rest upon his Fifth Amendment privilege against self-incrimination rather than his Sixth Amendment right to counsel because he at no time requested a lawyer. Upon Boyce's showing that he asserted his wish to remain silent, after *Miranda* warnings had been given, the Government had the burden of proving that Boyce's request was " 'scrupulously honored' " (*Michigan v. Mosley* (1975) 423 U.S. 96, 103–04, 96 S.Ct. 321, 46 L.Ed.2d 313) and that questioning was not resumed before Boyce made a knowing and intelligent waiver of his continued right to silence. (*Ibid.*) The district court decided these issues against Boyce, and the question before us is whether the evidence sustained the district court.

The testimony about the events that preceded Boyce's confession was sharply conflicting. The following facts appear from evidence that was credited by the district court:

Boyce was arrested by FBI agents early in the afternoon of January 16, 1977. He was promptly informed of his *Miranda* rights. Thereafter, he gave written consent to search his car and his home, al-

though he was told that he did not have to do so. He at first declined to sign a form containing the *Miranda* warnings and a waiver of rights. However, despite his refusal to sign the waiver form, Boyce freely talked about his personal background and other matters from the time of his arrest until late afternoon. During the one and one-half hour drive from Riverside, California, to Los Angeles, where Boyce was booked, the agents did not question him directly about the crime and he did not discuss it with them. When Boyce and the agents reached the FBI office in Los Angeles, Boyce asked to talk with someone in the CIA. The agents told him that some FBI agents with high security clearances were present, and he could talk to them. He refused. Boyce then asked to be alone to collect his thoughts. He was given a room to himself, and one of the agents brought him coffee. Boyce later asked one of the agents if anyone else had been arrested, and the agent told him that he did not know. Still later, as agents were preparing to take Boyce to the county jail, another agent told Boyce that Lee had also been charged and that he was in custody in Mexico. Boyce thereupon said, "Let's talk." Thereafter, he signed the waiver of rights form that he had previously declined to sign, and he also signed a statement that his decision to talk was voluntary and that any delay at the FBI office before taking him to the county jail was at his own request. About 7:00 p. m. that evening, Boyce confessed.

■ Boyce first argues that the "Let's talk" episode was not a waiver of his right to silence because his consent to speak was the product of an earlier assertion of his right to silence that was not honored. His theory is that he first asserted his wish to remain silent when he declined to sign the waiver forms initially presented to him. Under some circumstances, declining to sign a *Miranda* waiver form will be an assertion of the right to silence, but that is not this case. Boyce's conduct both preceding and following his refusal to sign the waiver forms was inconsistent with an assertion of his right to silence. He talked freely to the agents about all kinds of matters that were not related to the Pyramider scheme, and when he did not want to answer a particular question, he did not do so. On this record, the district court did not err in refusing to find an assertion of Boyce's right to silence when he first declined to sign the waiver forms.

■ After he reached the FBI office, Boyce explicitly told the agents that he did not want to talk. His request was honored. Questioning was not resumed, according to the Government's version of the facts, until he initiated a discussion by his inquiry concerning the arrest of anyone else. He was not again questioned until after he had been informed that Lee was under arrest and Boyce volunteered, "Let's talk." Upon these facts, the district court did not err in concluding that Boyce voluntarily and knowingly waived his right to silence. (*Michigan v. Mosley, supra,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313; *cf. United States v. Rodriguez-Gastelum* (9th Cir. *en banc* 1978) 569 F.2d 482 (waiver of right to counsel by in-custody suspect).)

■ Finally, Boyce urges that his confession was involuntary because the FBI agents subjected him to psychological pressure. Although the agents never directly questioned Boyce about the charges against him before he signed a waiver statement, they asked him many questions about all kinds of personal matters, appealed to his loyalty to his country and his family, and invited him to consider whether it would be to his advantage to discuss whatever was on his mind with the agents. The agents also periodically repeated the warning that Boyce was under no obligation to talk. Boyce argues that the impact of the interrogation was analogous to the "Christian burial speech" described in *Brewer v. Williams* (1977) 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424. We are unable to perceive any similarity between the two cases. *Williams* concerned the waiver of the right to counsel, rather than the waiver of the right to silence. Williams was known by the police to be a young man with unusual

religious convictions and a history of mental illness. He had been arrested in Davenport, Iowa, on suspicion of abducting and murdering a 10-year old girl on Christmas Eve. He was driven to Des Moines in the custody of two police officers, both of whom were fully aware that Williams was represented by lawyers in both Davenport and Des Moines and that the lawyers had advised him not to discuss the charges with police until he had talked with them. Moreover, one of the officers had made an agreement with Williams' lawyer, McKnight, that the officers would not question Williams during the drive. Nevertheless, Detective Leaming began a wide-ranging conversation on many topics, including religion, as soon as the journey began. He addressed Williams as "Reverend," and made an emotional appeal to Williams to show the officers the gravesite to permit the body of the little girl to be returned to the parents for a Christian burial. In our case, the FBI agents may have attempted to create a climate which would be conducive to extracting inculpatory information. However, a fair reading of the whole record of Boyce's interrogation supports the district court's finding that Boyce's confession was voluntary. Nothing in the record suggests that his will was in any respect overborne. Boyce was a highly intelligent man and answered questions selectively. He demonstrated that he was fully able to assert his right to silence when he chose to do so.

### III

■ Boyce next argues that his conviction under 18 U.S.C. § 798 should not be sustained because the Pyramider documents were improperly classified. He also challenges his conviction under 18 U.S.C. §§ 793 and 794 on the ground that the documents did not relate to the "national defense"

within the meaning of those statutes. We reject both contentions.

Section 798, in pertinent part, provides:

"(a) Whoever knowingly and willfully communicates, furnishes, transmits, or otherwise makes available to an unauthorized person, . . . any classified information . . . (2) concerning the design, construction, use, maintenance, or repair of any device, apparatus, or appliance used or prepared or planned for use by the United States . . . for cryptographic or communication intelligence purposes; . . . [s]hall be fined . . . or imprisoned . . .."

Under section 798, the propriety of the classification is irrelevant. The fact of classification of a document or documents is enough to satisfy the classification element of the offense. (Cf. *Scarbeck v. United States* (1963) 115 U.S.App.D.C. 135, 317 F.2d 546 (interpreting similar language in 18 U.S.C. § 783(b)).)

■ Boyce's argument that the Pyramider documents did not "relate to the national defense" within the meaning of 18 U.S.C. §§ 793 and 794 [1] assumes that the term "national defense" is limited strictly to information concerning the "military establishment" and military preparedness for defending the territory of the United States. But his narrow interpretation has been specifically rejected by the Supreme Court. (*Gorin v. United States* (1941) 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488.) The Court said that "national defense" is "a generic concept of broad connotations, referring to the military and naval establishments and to the related activities of national preparedness." (*Id.* at 28, 61 S.Ct. at 434.) *Gorin* specifically dealt with counterespionage activities, albeit within the geographical boundaries of the United States. Here, the jury was instructed upon the concept, and

1. 18 U.S.C. § 794(a) provides, in relevant part: "(a) Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, . . . or to any representative, officer, [or] agent . . .

thereof . . . any . . . information relating to the national defense, shall be punished by death or by imprisonment . . .."

Section 793 contains similar language using the phrases "information respecting the national defense," "anything connected with the national defense," and "information relating to the national defense."

no objection was taken to the jury instructions. Thus, the jury determined that the Pyramider documents were "national defense" information, and the evidence was adequate to support the jury's conclusion.[2]

## IV

Boyce contends that the district court abused its discretion in admitting filmstrips of the Pyramider documents seized from Lee by the Mexican authorities upon the ground that the Government failed to establish a proper chain of custody. The Government did not produce testimony by the Mexican officials about the seizure and retention of the filmstrips. The district court did not abuse its discretion when it decided that the foundation for the receipt of the documents was adequate to establish their authenticity. (*United States v. Godoy* (9th Cir. 1975) 528 F.2d 281; *Gallego v. United States* (9th Cir. 1960) 276 F.2d 914.) The district court could properly determine that the Government had made an adequate showing that the filmstrips were the same strips that had been seized from Lee and that they were in substantially the same condition as they were at the time of seizure.

## V

Boyce's contention that his discovery was improperly curtailed need not detain us. Boyce's counsel was given access to the filmstrips and to other matters material to his defense. The prosecution required that the documents subject to inspection remain in governmental possession. That requirement may have caused Boyce's counsel some inconvenience, but there was no deprivation of any of his discovery rights. A few materials were sealed, and the court examined them *in camera* to determine whether they contained any exculpatory matter discoverable under *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. The district court decided that they did not contain any exculpatory matter, and our independent review of the same documents leads us to the same conclusion. (*See United States v. Lasky* (9th Cir. 1977) 548 F.2d 835.)

## VI

Boyce claims the district court improperly denied him the benefits of the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–26 (1976). The district court made an express finding that Boyce would not benefit from treatment under the Act. That finding complies with the requirements of *Dorzynski v. United States* (1974) 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855. The district court is not required to elaborate its reasons for reaching its non-benefit conclusion. Although Boyce's sentences are severe, all of them are within the limits of the applicable sentencing laws.

## VII

PER CURIAM:

Boyce's sentence on the section 641 count was concurrent with his sentences on the other counts. Under these circumstances, we decline to reach the question whether section 641 is applicable to the misappropriation of the Government's intangible interests in the documents that were photographed.[1]

AFFIRMED.

---

**2.** Boyce's First Amendment attack on sections 793 and 794 as unconstitutionally vague is also foreclosed by *Gorin*, which held that the predecessor statute to sections 793 and 794, which are indistinguishable for this purpose, was constitutionally sufficient.

**1.** Judge Hufstedler expresses her disagreement with the majority's declination to reach the merits of the section 641 count.